IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOHNNA L. RAPP

    Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

OPINION & ORDER

12-cv-353-wmc

    Plaintiff Johnna L. Rapp seeks judicial review of a final determination by the Commissioner of Social Security finding that she was not disabled within the meaning of the Social Security Act. Rapp principally contends that remand is warranted because: (1) the administrative law judge ("ALJ") failed to properly accommodate her mental health limitations regarding concentration, persistence and pace by equating them to being off task for 10% of the day; and (2) the ALJ provided a flawed credibility assessment. For the reasons set forth below, the case will be remanded to the Commissioner for rehearing.

**FACTS**

**I. Background**

    On December 23, 2011, Administrative Law Judge Joseph Jacobson issued a decision denying Rapp's application for Supplemental Security Income ("SSI"). (AR 10.)[1] Rapp filed a request for review of the ALJ's decision. On April 3, 2012, the Appeals Council denied Rapp's request, making the ALJ's decision the final determination of the

---

[1] The citations in this Order are drawn from the Administrative Record ("AR"). (Dkt. #7.)

Commissioner. (AR 1.) On May 11, 2012, Rapp filed a timely complaint for judicial review in this court under 42 U.S.C. §405(g).

## II. Relevant Medical Evidence

Rapp's detailed medical history from 2008 through 2011 is addressed in her brief. (Pl.'s Opening Br. (dkt. #11) 2-10.) As early as 2006, Rapp apparently received some mental health treatment, but did not start a period of sustained treatment until 2008. (Pltf. Br. (dkt. #11) 2.)

In early 2008, Rapp was diagnosed with major depression and prescribed Wellbutrin. (AR 338, 339.) By November 2008, the diagnosis included a mood disorder, as well as "major depression, recurrent, moderate." (AR 344.) After a suicide attempt in July of 2009, Rapp was diagnosed with major depressive disorder, recurrent, with underlying dysthymia, anxiety disorder, with possible elements of PTSD and borderline personality disorder. (AR 257, 264.) At that point, she was and prescribed Wellbutrin and Gabapentin. (*Id*.)

### A. Opinion of Denise Darling, MS

Rapp participated in a period of therapy sessions with Denise Darling at Arcadia Clinic from November 10, 2008, through May 10, 2010. On November 10, Darling noted that Rapp "describes herself as being 'one minute in a great mood' and 'the next minute screaming angrily and mad' . . . was physically agitated through most of today's session." (AR 344.) On November 17, Darling noted "[a]fter seeing this clinician last Tuesday, client went into a higher energy time for the rest of that Tuesday, Wednesday

and Thursday, and meets every requirement for a manic episode." Darling also noted that Rapp "says she want to be normal and feel normal. Unfortunately, client cannot get into see Dr. Warsing until December." (AR 347-48.) At a session on December 2, Rapp was reverberating tension and "shaking something – mostly her legs" during the entire session. (AR 351.) By December 29, 2008, some depression had lifted, but Rapp's level of irritability remained the same. (AR 358.)

At a session on February 2, 2009, Rapp reported being depressed for the first 2 weeks in January, which caused her to miss an appointment; she also admitted not being good at taking her medication when depressed. Darling opined "early abuse [by Rapp's mother] would have laid the groundwork for borderline features, and hereditary probably provided the genetic configuration on bipolar-ism." (AR 362.)

On July 28, 2009 (approximately three weeks after Rapp's suicide attempt), Darling noted "symptoms of dizziness, weakness, and shaking have not abated. Severe level of distress due to [Rapp] feeling like a failure as a mother because she cannot play with [her son] right now." (AR 407.) On August 27, Rapp reported continued mood swings, but dizziness was better. She also reported partial compliance with her meds. (AR 417.) On September 8, Rapp reported her depression had "not been good lately." Darling noted that Rapp alternated "as only a Borderline can do" between wanting to leave her husband and declaring how much she loved him. (AR 419.) On September 28, Rapp reported having "3 to 4 panic attacks per week, the majority of anxiety/panic symptoms, and almost every depressive aspect listed." Darling opined "the most worrisome thing is that the suicidal thoughts and development of a plan can happen

impulsively, as happens specifically with a Borderline. [Rapp] comments on sometimes wanting to not have to take her medication but also indicates current compliance." (AR 423.)

By November 2, 2009, Rapp was noted as doing well with less depression, but that she was not taking her medicines. (AR 425.) On November 17, Rapp denied any thoughts of self-harm and reported she was in full medication compliance. (AR 427.)

On January 5, 2010, Rapp reported being depressed again with suicidal thoughts. (AR 437.) On February 22, she reported medication compliance and that things were going well. (AR 447.) By March 29, Rapp reported no thoughts of self-harm, despite being "off her meds for 2 weeks and just compliant for the last 2 days," resulting in more mood swings. (AR 449.) On May 6, Rapp was apparently discharged, having "stopped attending due to significant improvement in symptomology." (AR 453.)

**B. Opinion of George Melynk, M.D.**

While attending counseling sessions with Psychologist Darling, Rapp also saw Dr. George Melynk of the La Crosse Clinic. On December 4, 2008, Melynk opined a "current ongoing stressor seems to be conflictual relationship with her husband . . . history of poor coping. In the past, she has cut herself for relief and, several weeks ago, overdosed on her husband's pain medicine." Melynk also noted that Rapp reported being "compliant with her meds," while her "therapist strongly suggests a bipolar disorder." (AR 353.)

On July 14, 2009, Melynk noted: that Rapp "was recently hospitalized on the Inpatient Psychiatric Unit . . . for a brief stay"; that "she stopped taking her medications

4

for at least 3 weeks and did not notify us"; that she "indicates . . . the medication has been helpful to her, as it assisted mood stabilization"; and that she "does not really give the reason as to why she stopped taking the medication." (AR 320.) On July 30, Melynk noted that Rapp was "compliant with her medication regimen," and that while her mood was irritable, she denied any suicidal thoughts. (AR 318.)

On January 21, 2010, Melynk noted that Rapp reported struggling with depression a couple weeks ago, stating "I was kinda suicidal then" although there was no "adverse outcome." (AR 443.) He goes on to note that: her "mood swings are a little better . . . continues to be involved with therapy . . . was engaged during the visit. She is compliant with her meds." (*Id*.)

On April 8, 2010, Melynk noted that Rapp was "taking school classes online . . . under stress . . . had some feelings of wanting to cut again . . . had become noncompliant with her medications." Melynk further noted that Rapp "kept forgetting to take" [her medications] as she "got busy at school . . . then felt worse"; "started taking them again, a week ago" as "they have helped me before"; and was going to return to her sessions with Darling. (AR 451.)

### C. Opinion of Roger Rattan, Ph.D.

On December 7, 2010, Dr. Roger Rattan, a State Agency psychologist, concluded that Rapp had severe impairments relating to mood, depressive, anxiety and borderline personality disorders. (AR 85.) More specifically, Dr. Rattan found Rapp had moderate limitations in social functioning and in concentration, attention, and work pace. (*Id*.) This opinion was afforded "great weight" by the ALJ. (AR 20.)

Dr. Rattan also found that Rapp would have moderate limitations in understanding, remembering and carrying out detailed instructions, maintaining attention and concentration for extended periods of time, sustaining an ordinary routine without special supervision, working in coordination with or in proximity to others without being distracted by them, interacting with the general public, accepting instructions and responding appropriately to criticism from supervisors, being able to get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in work settings. (AR 86-87.) Notwithstanding these limitations, Dr. Rattan further noted that Rapp "retains the ability to meet the basic mental demands of unskilled work." (AR 88.)

## III.  ALJ Decision

On December 23, 2011, the ALJ found that Rapp had not engaged in substantial gainful activity since October 31, 2006, the alleged onset date. The ALJ also found the following "severe" impairments: 'affective disorder, anxiety disorder, and personality disorder.'" (AR 15.)  With regard to the mental listings, however, the ALJ found no more than moderate restrictions in the activities of daily living, and moderate limitations in social functioning and concentration, persistence or pace. (AR 16.) Specifically, with regard to concentration, persistence and pace, the ALJ found that while Rapp "has alleged difficulties with attention, concentration, memory, completing tasks and following instructions . . . her doctors have not documented any objective findings consistent with significant deficits in this area of functioning." (AR 16.)

Based on these finding, the ALJ determined that Rapp had the Residual Functional Capacity ("RFC") to perform

> a full range of work at all exertional levels but with non-exertional limitations. She is limited to simple, routine, repetitive tasks in a low stress job, defined as one with only occasional decision making or occasional changes in the work setting required. She is limited to occasional interaction with the public and coworkers with no tandem tasks. She is precluded from piece work or production line type work. She must be allowed to be off task up to ten percent of the work day in addition to regularly scheduled breaks.

(AR 17.) At step four, the ALJ determined that Rapp had no past relevant work. (AR 20.)

At step five, the ALJ relied upon a vocational expert's opinion that given the claimant's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that the claimant could perform. Accordingly, the ALJ found that Rapp was *not* under a disability as defined in the Social Security Act. (AR 21.)

## OPINION

When a federal court reviews a final decision by the Commissioner of Social Security, the Commissioner's findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the

7

evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Even so, a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence. *See Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). A decision cannot stand if it lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ must also explain his "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Id.; see Herron v. Shalala*, 19 F.3d 329, 333–34 (7th Cir. 1994). Moreover, when the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

"Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (citing *Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir. 1991)); *see also Richards v. Astrue*, 370 F. App'x. 727, 731 (7th Cir. 2010) ("[A]n ALJ may not draw conclusions based on an undeveloped record and has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable"); *Smith*, 231 F.3d at 437 (stating that "failure to fulfill this obligation is 'good cause' to remand for gathering of additional evidence").

Rapp principally contends that the ALJ erred in equating her moderate limitations on concentration, persistence and pace ("CPP") to being off-task for 10% of the day without any evidentiary basis for doing so. Because this same erroneous equivalency was

used by the ALJ in framing his RFC, Rapp contends that the hypothetical questions posed to the vocational expert ("VE") were similarly deficient. (AR 33.) *See Steele* 290 F.3d at 942 (hypothetical questions posed to the VE "ordinarily must include all limitations supported by medical evidence in the record").

In *O'Connor–Spinner v. Astrue,* the state examiner and the ALJ concluded that the claimant had moderate limitations in CPP because of her depression, but the ALJ asked the VE to consider only a "hypothetical worker [who] was restricted to routine, repetitive tasks with simple instructions." 627 F.3d 614, 617 (7th. Circ. 2010). On appeal, the Seventh Circuit rejected the Commissioner's argument that the limitation to routine and repetitive tasks "implicitly incorporated" limitations for concentration, persistence and pace because "[t]he ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *Id.* at 620.

The *O'Connor–Spinner* court held instead that limiting the hypothetical worker to routine repetitive tasks did not adequately "orient the VE to the totality of a claimant's limitations." *Id.* While some exceptions exist to this general rule,[2] the Seventh Circuit further held in *O'Connor-Spinner* that the ALJ should refer "expressly to limitations on concentration, persistence, and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *Id.* at 620-21.

---

[2] The exceptions include: "(1) where the record revealed that the VE had reviewed the claimant's medical records or heard testimony about the limitations; (2) where the ALJ used alternative phrasing and "it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform; or (3) where the ALJ's hypothetical question specifically mentioned the underlying condition that caused the difficulties with concentration, persistence, and pace." *O'Connor–Spinner*, 627 F.3d at 619–20.

Much like *O'Connor–Spinner*, the ALJ here intended to implicitly incorporate Rapp's moderate limitations for CPP by adding a provision in the RFC that Rapp would be off-task 10% of the day. And like *O'Connor–Spinner*, the ALJ failed to *explain* why the 10% limitation he arrived at properly characterizes each of the claimant's moderate limitations in CPP.[3] In particular, the ALJ fails to provide adequate support in the record to uphold this supposed equivalence was based upon substantial evidence.

An ALJ must assess a claimant's RFC "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1). Examples of the types of evidence are the claimant's medical history, medical signs and laboratory findings, and medical source statements. SSR 96–8p. Relevantly:

> The RFC assessment *must include a narrative discussion describing how the evidence supports each conclusion*, citing specific medical facts . . . and nonmedical evidence . . . . [T]he adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also *explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved*.

SSR 96–8p (emphasis added).

As an initial matter, the evidence supporting a conclusion going to a claimant's CPP is critical. It forms the core of their mental limitations (*i.e.* non-exertional limitations). Sufficient disability in a claimant's mental limitations can result in the claimant gridding out at step three of the sequential evaluation analysis. Where, as here,

---

[3] There is the issue, addressed later, whether each of the limitations have been accommodated for in the RFC in light of the Seventh Circuit's more recent decision in *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014).

a claimant is not found disabled at step three, the ALJ must properly formulate an RFC step four so to reflect a claimant's ability to perform full time work.[4]

Here, the ALJ found that Rapp's residual functional capacity -- limitations included in the hypothetical question to the VE -- was sufficiently accounted for by her being off-task for 10% of the day. This was presumably predicated on the opinion of state psychologist, Dr. Rattan, whose opinions were afforded "great weight" in the ALJ's decision. (AR 20.) But nowhere in the opinion does Dr. Rattan provide this limitation. Instead, he provides limitations that are qualitative in nature -- including: moderate limitations in (a) understanding, remembering and carrying out detailed instructions, (b) maintaining attention and concentration for extended periods of time, (c) sustaining an ordinary routine without special supervision, (d) working in coordination with or in proximity to others without being distracted by them, (e) interacting with the general public, (f) accepting instructions and responding appropriately to criticism from supervisors, (g) being able to get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and (h) responding appropriately to changes in work settings. (AR 86-87.)

Notwithstanding the absence of quantitative data supporting the 10% off-task limitation, the ALJ does not even attempt to explain how Dr. Rattan's qualitative limitations lead to the quantitative limitation adopted by the ALJ in formulating Rapp's RFC. The ALJ also cites no regulation, law or Social Security Ruling as to how an ALJ

---

[4] In this court's view, what is really missing is a Social Security Ruling that provides clarification on the issue of CCP. More specifically, the ruling should set forth what evidence or factors can be relied up on by an ALJ in formulating the quantitative and qualitative limitations where CCP is concerned.

would come to such a decision. Indeed, without more, the 10% figure doesn't point in favor of Rapp's disability claim; rather, it possibly points the other way as the vocational expert could well have understood the evidence to mean that Rapp was capable of working 90% of the time despite the qualitative limitations credited in the medical record. While this view is speculative, it presents the precise problem that SSR 96–8p seeks to guard against by requiring the ALJ to include "a narrative discussion describing how the evidence supports each conclusion."[5]

Thus, the ALJ's failure to comply with SSR 96–8p constitutes error. Indeed, given the ALJ's silence and the minimal record, it cannot be said that Rapp was any more or less likely to be off-task 10% of the day than being off-task for 50% of the day. Because of this failure to provide a rationale to support the conclusion drawn in the RFC, the ALJ's decision is not based upon substantial evidence and remand is required. *See* SSR 96–8p

Two further reasons fortify this conclusion. Both are mandated by the Seventh Circuit. The first is that an ALJ must explain his analysis of the evidence with enough detail to permit meaningful appellate review. *See Herron,* 19 F.3d at 333-34; *see also Tapia v. Astrue*, 2012 WL 3100380 *8 (E.D.Wis.July 30, 2012) (case remanded when "the ALJ took no effort to explain why Plaintiff would be off task 5% of the time"). The ALJ has failed in this respect, providing further grounds for remand since the court cannot meaningfully assess whether substantial evidence supports the 10% limitation when *no*

---

[5] By providing a narrative, it also prevents the ALJ from playing doctor and supplying conclusions in the RFC without substantial evidence. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir.1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")

evidence is offered at all. *See Ehrhart*, 969 F.2d at 538 (explaining that a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence).

Second -- and in relation to the specific limitations enunciated by Dr. Rattan -- the Seventh Circuit has gone to great pains in holding that each of a claimant's specific deficiencies in CPP should be articulated in an RFC determination. In *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014), for example, the Seventh Circuit detailed moderate limitations in CPP, identified by the claimant's doctor, in his "(a) ability to carry out detailed instructions, (b) perform within a schedule, (c) be punctual, (d) perform at a consistent pace, and (e) to complete a normal workday and workweek." *Id.* at 857. Given these limitations, the Seventh Circuit was "hard-pressed to conclude" that the ALJ's RFC finding was adequate in describing him as an individual who "could perform unskilled tasks, related superficially to small numbers of people, and attend to tasks long enough to complete them." *Id.* at 857-58.[6] The Seventh Circuit remanded for further proceedings, concluding that the ALJ failed to "build an 'accurate and logical bridge' between the evidence of mental impairments and the hypothetical and the mental RFC." *Id.* at 859.[7]

---

[6] Finding that the RFC and questions to the vocational expert were deficient, the court also stated that "the hypothetical [question] does nothing to ensure that the VE eliminated from her responses those positions that would prove too difficult for someone with [the claimant's] depression and psychotic disorder." *See Yurt*, 758 F.3d at 857-58.

[7] There is also the issue of whether evidence suggests a flawed credibility finding. The ALJ criticized Rapp for not being fully credible, using improper boilerplate language and then failing to provide sufficient other grounds upon which the finding could be sustained. Given that the RFC determination requires further explanation, which may well lead to a change to the RFC determination itself, the ALJ should further consider Rapp's credibility on remand.

Notably, there are more moderate limitations in this case than in *Yurt*, but this only reinforces the need for the vocational expert to be accurately informed, either through a re-formulated RFC determination or by inspection of the medical records. Taking this course is consistent with what the Seventh Circuit stated in *O'Conner-Spinner* -- *i.e.* that the ALJ must "orient the VE to the totality of a claimant's limitations." 627 F.3d at 620. Accordingly, on remand, the ALJ should not only explain the basis for the 10% limitation, but why *each* of the limitations ((a)-(h)) are not *expressly* reflected in the RFC determination.

## ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Johnna L. Rapp's application for disability benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff Johnna L. Rapp's and close this case.

Entered this 18th day of March, 2015.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge